IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

LUKE CASSIDY BOLTON,           §
                               §
Petitioner,                    §
                               §
v.                             §    Civil No. 7:14-CV-004-O-KA
                               §
WILLIAM STEPHENS, Director,    §
Texas Department of Criminal Justice,  §
Correctional Institutions Division,    §
                               §
Respondent.                    §

## FINDINGS, CONCLUSIONS AND RECOMMENDATION

By Order of Reference (ECF 24) this § 2254 habeas corpus case was referred to the undersigned for a hearing, if necessary, proposed findings of fact, conclusions of law, and recommendation for disposition.

## Procedural History

On December 3, 2009, in the 89th District Court of Wichita County, Texas, Petitioner Bolton was convicted by a jury of the offense of sexual assault and was sentenced to a term of twenty (20) years in Texas prison.[1] Bolton made a direct appeal to the Court of Appeals, but his conviction was affirmed in January 2011.[2] His petition for discretionary review with the Texas Court of Criminal Appeals was refused on June 29, 2011.[3] Bolton did not seek certiorari by the Supreme Court. Then,

---

[1]   ECF 12-9, p. 12. Judgement and Sentence.  References to the state court record on file herein shall be to ECF docket number, followed by appendix or exhibit number, then page number(s) as applicable, ignoring the referenced document's internal numbering.

[2]   ECF 12-9, pp. 22-27;  *Bolton v. State*, No. 8–10–00092–CR, 2011 WL 241977 (Tex. App. – El Paso 2011, pet. ref'd).

[3]   *Bolton v. State*, PDR No. 821-11.

1

instead of filing a state habeas corpus petition to challenge his conviction, Bolton filed a federal habeas petition in this Court in October, 2011, but after a delay of 578 days it was dismissed without prejudice as unexhausted in May of 2013.[4] Following the dismissal of his federal petition, Bolton filed his state application for writ of habeas corpus on June 11 , 2013.  Following a trial court review of extensive affidavit testimony from Bolton and multiple other participants in his arrest, prosecution and defense, the trial court entered extensive findings of fact and conclusions of law[5] which (except for conclusion #33)[6] were explicitly adopted by the Court of Criminal Appeals on December 11, 2013 in its written order of denying relief.[7]  A month later on January 7, 2014, Petitioner Bolton filed his petition herein.[8]

<u>Background of the Offense</u>

As summarized by the Court of Appeals in its decision on Bolton's direct appeal the factual background of Bolton's charged offense was:

"As a prisoner in the Montague County Jail, Appellant began a relationship with Darlene Walker, who was employed as a detention officer. The relationship soon became sexual, and Walker was later indicted for improper sexual activity with a person in custody. Nevertheless, the relationship continued, and once Appellant was released from the jail, he and Walker moved into a house in Bowie, Texas. Subsequently, on August 18, 2008, Walker, in an attempt to get Appellant to stop physically abusing her, asked that they go get pizza. As they drove

---

[4]     *Bolton v. Director*, CA No. 7:11-CV-129 (N.D. Tex. 2013).

[5]     ECF 12-9, pp. 231-250.

[6]     Which exception shall be discussed hereinafter.

[7]     ECF 12-10, pp. 2-3; this order followed an earlier order denying the application "without written order." ECF 12-9, p. 2.

[8]     ECF 3. Note: the difference between the January 7, 2014 date the petition was placed in the prison mail versus the January 9, 2014 date of actual docketing in this court is immaterial to this case.

from their residence towards the Pizza Hut in Bowie, Walker told Appellant that she wanted him to leave, and in response, Appellant struck Walker several times with a closed fist. Appellant further struck Walker when they turned onto a dirt road close to Nocona, a town in Montague County. At that point, Appellant stopped the car and digitally penetrated Walker's vagina and anus without her consent. When they stopped at a gas station in Pilot Point, Walker escaped and reported Appellant's assaultive conduct to Pilot Point Officer Reese Dunn. Although she did not report the sexual assault to Officer Dunn, she did tell an officer employed with Montague County."[9]

## Prior Proceedings Herein

In an initial response to Bolton's petition in this case, the State filed a motion to dismiss raising the issue of the AEDPA one-year statute of limitations bar.  ECF 13. Upon consideration, the District Court denied that motion and directed the State to respond on the merits. ECF 22. The State has filed its response, as amended. ECF 30.

## Petitioner's Claims

By his petition herein, Bolton makes for three basic Constitutional claims:

1.  Prosecutorial Misconduct in suppressing exculpatory evidence (relating to a cell phone, a letter and officers' reports),  *Brady* violations, leading to a denial of the Constitutional Right of Confrontation of witnesses;
2.  Ineffectiveness of Counsel, a *Strickland* violation, leading to a denial of Procedural Due Process; and,
3.  Actual Innocence, arising from total lack of proof of his guilt of the sexual assault charge since the testimony of the victim as to the sexual nature of the assault was unbelievable  and uncorroborated by other witness or tangible evidence.

## State's Response

The AEDPA provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "The presumption of correctness not only applies

---

[9]      ECF 12-4, p. 1-2.

to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001). The State rightly relies extensively on the AEDPA presumptions attendant to state court findings and conclusions arising from the state trial court's extensive plenary consideration of the merits of Bolton's habeas claims that raised  these same issues at the state court level. The state trial court made extensive fact findings and conclusions of law with respect to Bolton's claims of prosecutorial misconduct and the conduct of Bolton's trial counsel. It is upon these findings and conclusions that the state invokes the presumptions of correctness and denies any effective rebuttal by Bolton.  With respect to Bolton's claim of "actual innocence" the state further asserts that it is a mere naked claim, unsupported by any independent constitutional violation as required under the holdings in *Herrera v. Collins*, 506 U. S. 390 (1993) and *Boyd v. Puckett*, 905 F. 2d 895, 896-97 (5th Cir. 1990).

<u>Background</u>

Bolton's claims, culminating in his claim of actual innocence, arise in the confluence of facts collaterally addressed in the trial record.  First, a somewhat contemporaneous investigation by the Texas Rangers and the FBI, which Bolton claims he initiated,[10] uncovered a pattern of gambling, drug trading, and sexual  activities between the inmates (male and female) and corrections officers (male and female) at the Montague County Jail,[11] resulting in the subsequent indictments and

---

[10]    By a written communication through Texas Ranger Jesse Valdez to James Holland, a investigating officer with the Texas Rangers,  relayed to the Montague County District Attorney's investigator.  *See*  ECF 12-9. p. 165. Detailed in FBI interviewed report at ECF 12-9, pp. 225-228.

[11]    In Bolton's own words at ECF 12-9, pp. 184, ¶ 3 and Investigation Report of FBI Agent Charles Jones ECF 12-9, pp. 226-228.

convictions of the Montague County Sheriff, William Keating,[12] and the Montague County Jail Administrator, Harry Bittlinger.[13]  As the jail administrator Bittlinger worked under the supervision of Keating.  Second, at the time of the actions resulting in the charged sexual assault, the victim, Darlene Walker, who had recently been a corrections officer at the Montague County Jail,  had already been involved in an extensive sexual relationship with Bolton in and out of the jail.[14]  Third, Walker acknowledged in her trial testimony that although she had initially reported Bolton's sexual assault in a complaint to a neighboring town's law enforcement officer she withdrew her complaint to his office.  But she did report the sexual assault in her own written statement a few days later to Deputy Lindsey Andrews, a Bowie police investigator, who was later instrumental in initiating the original charges against Bolton and his subsequent arrest on those charges.  Andrews was never called to testify at the trial.  While Walker testified that Bolton sexually assaulted her by groping her pubic area and penetrated her vagina and anus with his fingers, she refused available and offered medical attention at the Pilot Point police station within hours after the incident. Fourth, an Inmate Property Release form Bolton signed to release his cell phone and other property from jail custody to his attorney for safe keeping, listed a cell phone as one of the items returned.[15] Similarly, the Property Return Receipt form signed by Bolton's attorney lists a cell phone.[16]

---

[12]     *US v. Keating*, Cause No. 7:09-CR-03 (Wichita Falls Division, N.D. Tex.2009).

[13]     *State v. Bittlinger, et al.*, Cause No. 2009-0000031M-CR, Montague County Texas.

[14]     ECF 12-9, p. 184, Proposed Findings of Fact tendered to trial court in habeas proceeding.

[15]     *Id.* p. 86,  but not expressly one by the brand name "Motorola."

[16]     *Id*. p. 87, without a brand name but notes that the cell phone was the one "provided by Harry" (an apparent reference to Harry Bittlinger.)

## Prosecutorial Misconduct Issues

With respect to Bolton's claims of prosecutorial misconduct Bolton identifies three items he claims the prosecution did not make available to him or his attorney for use in the trial: a Motorola cell phone, a letter from the victim to Bolton, and the written reports of two investigating officers, items he claims would have permitted an effective cross-examination of the alleged victim, destroying her credibility, establishing his innocence to the jury.

## Cell Phone Claim

Bolton's entire habeas arguments before this Court concerning the cell phone proceed from the premise that the Montague County Law enforcement officials came into possession of Bolton's "Motorola" cell phone upon which was recorded statement of the victim that exculpated Bolton from the sexual offense charge. He claims that a Motorola cell phone came into Harry Bittlinger's possession on September 12, 2008 when he transported Bolton from the Clay County jail back to Montague County.[17]  He claims that at 2 o'clock a.m. on August 23, 2008, fifteen (15) days after the sexual assault upon her, the victim, Darlene Walker, and Bolton engaged in a telephone conversation recorded on Bolton's "Motorola" cell phone during which she "admitt[ed] to the fraudulent nature of the sexual assault charge."[18]  Bolton laid out his cell phone claim before the state court in multiple documents, to-wit: his application for appointment of counsel for the writ proceeding,[19] his

---

[17]    ECF 12-9, p. 152.

[18]    ECF 31, p. 2, ¶ 1.

[19]    ECF 12-9,  pp. 30-31.

Application for the writ to the state,[20] his Reply to the State's Answer to his writ application,[21] his Response to the Affidavit of Harry Bittlinger,[22] Evidence to Rebut Harry Bittlinger's Affidavit,[23] his Rebuttal Evidence to Affidavit of McGaughey,[24] and a letter he wrote to his trial attorney,[25] and in his Proposed Findings of Fact.[26]  This record he supplements in this Court in his Response to the State's Answer.[27]

It appears clear from Bolton's own statements, the Affidavit of Bittlinger and the property release and receipt forms, that Bolton in fact turned over a cell phone to Harry Bittlinger; that a cell phone was placed taken into possession by Montague County law enforcement prior to Bolton's trial; that a cell phone was released from that possession to Bolton's trial counsel a month prior to his trial.

But it is unclear whether this cell phone was the Motorola cell phone upon which Bolton's claim relies or an LG brand cell phone.  Nonetheless, the state trial court expressly found that there was only one cell phone, and it was the one released to Bolton's attorney.[28]  There was no showing by Bolton and no express finding by the state trial court as to existence or content of any recorded

---

[20]    *Id.* p. 41.

[21]    *Id.* pp. 71, and exhibit pp. 75-76

[22]    *Id.* pp. 152-153.

[23]    *Id.* pp. 161-165

[24]    *Id.* pp. 166-167.

[25]    *Id.* p. 182.

[26]    *Id.* p. 183-194.

[27]    ECF 31.

[28]    Finding 69,  ECF 12-9, p. 241.

conversation of the cell phone released.  But the trial court did find that Bolton knew of the contents of the cell phone and disclosed them to his trial attorney.

Bolton identifies the second cell phone which he claims was withheld by the prosecution as a *Motorola* cell phone that he claims contained a recorded statement of a conversation between Darlene Walker, and himself. He says he gave that "Motorola" cell phone to Harry Bittlinger when Bolton was booked in to the Montague County Jail following his arrest in South Texas. He claims he told Montague County Sheriff's Deputy Ray Cesna, who had come with a bench warrant to pick up Bolton from the Gonzales County Jail, that the cell phone had recording of the alleged victim acknowledging that she had made a false report of the sexual assault to Lindsey Andrews, a female law enforcement officer for Montague County who was investigation the alleged sexual assault.

Bolton challenges the State habeas court's findings for failing to account for this second cell for which Bolton produces no evidence of its existence or content beyond the mere figments of his own imagination.  The only evidence Bolton proffers that there may have been a second cell phone is Bolton's letter to his attorney after the conviction,[29] and a transcript of an August 19, 2008 telephone conversation between Bolton and officer Robert Powell of the Pilot Point Police Department wherein Bolton implies that there is another phone by saying, "I'm on the other phone with the—uh, with the sheriff's department  uh, about last night, okay". . . " I'm on the other –I'm on the other phone with Darlene right now."[30]  These are items tendered by Bolton as attachments to his own affidavits in his state habeas proceeding.

---

[29]     ECF 12-9, p. 182 (an attachment to Bolton's Evidence to Refute Harry Bittlinger's Affidavit).

[30]     ECF 12-9, p. 154-55 (an attachment to Bolton's "Response to Affidavit of Harry Bittlinger).

The conversation with Officer Powell during which Bolton mentioned having two phones occurred on August 19, 2008, eleven (11) days after the incident and while Bolton was free and driving around in his vehicle.[31]  The phone actually delivered to Harry Bittlinger was the phone in Bolton's possession when he was picked up by Officer Ray Cesna from the jail in Gonzales County on September 12, 2008, thirty-five days after the incident.[32]   What may have happened to some purported second cell phone that had arguably been in Bolton's possession twenty four (24) days earlier is unknown and not shown in the record.  And there is no evidence whatsoever tendered by Bolton or otherwise (other than Bolton's own words) that the second phone ever existed or that it came into the possession or the knowledge of law enforcement or the prosecution team.

It is unclear whether the cell phone allegedly containing the statement made by Darlene Walker was Bolton's own cell phone or was Walker's cell phone, and whether it was a Motorola or an LG brand.  But it is clear from Bolton's own statements that the sole purpose for his desire to locate and produce the Motorola cell phone and any statement contained therein by Walker is for his attorney to have been able to use those statements to impeach Walker's trial testimony that Bolton assaulted her in a sexual manner during the eight (8) hour drive around the country-side.  The cell phone statement Bolton ascribes to Walker would not itself absolve him of the commission of the acts of assault which were confirmed by the pictures of her made by the Pilot Point police and by his own admission during his phone conversation with Pilot Point Officer Robert Powell. The only potential use of the alleged statement was for impeachment of Walker's trial testimony

---

[31]   ECF 12-7, pp.  100-01 (a trial transcript of Officer Powell's testimony) and State's Exhibit 10, ECF 19-8, pp.41-52 (a transcript of a tape recording of Bolton's conversation with officer Powell that was played for the jury and admitted into evidence at ECF 12-7, p. 102).

[32]   ECF 12-9, p. 152, from Bolton's own affidavit and Affidavit of Harry Bittlinger, ECF 12-9, p. 89-90.

regarding the *sexual* manner of the assault (a groping of Walker's pubic area and penetration of her vagina and anus by his fingers). And as reflected in the advice letter from his attorney, the legal condition to the use of that statement would have depended on its authentication which itself would have been dependent upon Bolton's own testimony, against which his own attorney strongly advised because that testimony would have exposed Bolton to the broad cross-examination putting his prior criminal record before the jury in a test of his credibility.

It is also unclear as to the actual content of the purported Walker statement. In one of his submissions, Bolton claims that the cell phone  statement by Walker was in the nature of an extortion (*ie*. "if I [Bolton] didn't return the new vehicle to her she would put me back w[h]ere she found me.").[33]  In his latest submission, he says the statement was in the nature of an admission (*ie*. she was "admitting to the fraudulent nature of the sexual assault charge.").[34]

The trial court made a credibility assessment of Bolton's submissions as compared to that of Harry Bittlinger, finding that Bittlinger's and McGaughey's Affidavits were credible[35] and that Bolton's allegations were not credible.[36] Further, there is no proof whatsoever that any of the Montague County law enforcement officers, much less the District Attorney McGaughey, ever listened to or heard the purported cell phone conversation from the existent cell phone or the purported second cell phone.  Since the existence of a second cell phone is unknown and  the content of the purported phone conversation is unknown, the effect such conversation might have on the jury during its deliberations is wholly speculative.  At best, the existence of a post-charge communication

---

[33]     *Id.* p. 184 ¶ 1.

[34]     ECF 31, p.2 ¶ 1.

[35]     ECF 12-9, p. 236

[36]     *Id.* p. 241.

attempt between the alleged victim and the alleged perpetrator might indicate that the sexual assault charge was fabricated. But that is wholly speculative as well. In the face of District Attorney McGaughey's unequivocal denial of any knowledge of the cell phone or of the conversations allegedly contained therein, the trial court's explicit fact findings that (1) there was only one cell phone and (2) that the District Attorney's Office was not notified by law enforcement, Bolton or Bolton's attorney of the existence of a second Motorola cell phone or its contents, are supported by the evidence before the trial court.  The trial court expressly found that the existence of a second cell phone identified by Bolton was not supported by the evidence before the Court.  Finally, the trial court made additional findings that Bolton and his counsel knew about the cell phone and its contents but failed to show that either the cell phone or the letter would have produced favorable evidence or that the outcome of the trial would have been different had the cell phone been examined and its contents disclosed to the jury.

In essence, Bolton's entire presentation in support of this claim is founded on the false premise that under the Constitution the state was required to prove the negative (*ie*. that it did not come into possession of a cell phone containing an exculpatory statement) rather than that Bolton was required is to prove the positive (ie. that the prosecution knew the content of an exculpatory statement and did not disclose it.)   The law is inapposite.

The AEDPA presumption to be applied to the trial court's fact findings controls the disposition of this issue. The AEDPA provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v.*

*Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001). Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found him guilty. 28 U.S.C. § 2254(e)(2).

Bolton has not adduced any new or previously undiscoverable evidence as to the existence or content of an exculpatory statement by the victim or of the medium (the cell phone) in which the statement may have been recorded nor that the statement or the medium was possessed by or known to the prosecution.   I find that no reasonable, fairminded jurist would find or conclude otherwise.

Letter Claim

By his petition, Bolton identifies a letter  from Darlene Walker directed to Bolton in March 2009, while Bolton was being held on the Walker initiated charges in the Wise County jail, some seven months after the incident.[37] He claims the letter was delivered by Walker to a jail employee to be delivered to Bolton, but it was instead diverted somehow to Montague County law enforcement.[38] The thrust of Bolton's argument is that the letter and its contents came into the possession of the District Attorney or his law enforcement team and should have been turned over to the Defendant or his counsel, so that it would be used in cross-examination to impeach Walker's

---

[37]   ECF 3, p. 6; ECF 12-9, p.43;  Also, Bolton references his attorney's memorandum (ECF 12-9, pp. 74-79) in March 2009 that has a one paragraph notation about a letter from Walker as a pre-trial contact attempt (*Id*.at 79) but the attorney advises no further attempt by Bolton to make contact with the victim.

[38]   Bolton also identifies another letter dated 11/17/2008 from Walker to Bolton, seized by Clay County jail personnel and diverted to Texas Ranger James Holland. ECF 12-9 p. 30-31

testimony.[39]   The actual content of the purported letter from Walker is not disclosed and remains unknown.  Since the content is unknown, it would only be the act of attempted contact by Walker to Bolton during the months between the time the Walker made her charges and the time she testified at trail that would imply that Walker's charges were falsely made. There is no evidence in the record beyond Bolton's bare assertion that the letter existed or that the prosecution was aware of such a letter from Walker or of its contents. While Bolton may have related to his counsel the possible existence of this letter, his counsel clearly made the strategic judgement call that it was so collateral  to Bolton's defense as it would not be worth further investigation into its existence or content.

The trial court found that the only letter identified and existent was a letter from Bolton himself to Walker; that Bolton knew about his own letter; that Bolton failed to show that any letter from Walker would have produced favorable evidence; and failed to show that there was any reasonable probability the outcome of the trial would have been different had such a letter been examined before the jury.  I find that the express findings by the trial court are supported by the evidence and that Bolton has failed to adduce evidence, much less clear or convincing evidence otherwise,  and I conclude that no reasonable, fairminded jurist would find or conclude otherwise.

## Officers' Reports Claim

Bolton claims that if his attorney had been provided with copies of the reports of Lindsey Andrews and James Holland, his attorney could have used them to cross-examine Walker to successfully impeach her testimony about the sexual manner of the assault.  But because access was denied by the prosecution, Bolton was deprived of his constitutional right of confrontation of witnesses.  Officer Andrews was a Bowie police deputy who conducted an interview with Darlene

---

[39]    Per Bolton argument at ECF 12-9, p. 167, ¶ 1.

Walker five days after the incident. She took a statement from Walker[40] wherein Walker charged that Bolton had assaulted her both physically and sexually. Bolton's attorney used Walker's statement extensively during his cross-examination of Walker.[41] The statement was taken five (5) days after Walker's interview by officer Dunn of the Pilot Point police department during which she had not related any information concerning the sexual nature of the assaultive acts of Bolton. The District Attorney never called Andrews to testify at the trial.

The trial court found that pursuant to the DA's open file policy "all statement and reports were delivered to Applicant's trial attorney, including those of Deputy Lindsey Andrews. There is nothing in the state record, or before this court, to show otherwise, except for Bolton's own conclusory assertions.  There is nothing in the state court record to indicate that Deputy Andrews made any "report" other than the taking of Darlene Walker's hand-written statement that she witnessed. There is nothing in Walker's statement that in and of itself is exculpatory of Bolton. Indeed, while Bolton's attorney tried to use the Walker written statement in comparison to her statement to Pilot Point Officer Dunn for impeachment purposes, the perceived inconsistencies between the statements were apparently considered inconsequential by the jury.

The District Attorney's explanation of his motivation in not calling Andrews as a witness during the trial is adequately explained in his affidavit[42] which the trial court found to be credible. There is absolutely nothing in the record to reflect that if Deputy Andrews had been called as a witness, her testimony would have been beneficial to Bolton.  I find that the trial court's findings

---

[40]     ECF 12-8, pp. 73-77 (Defendant's Exhibit 2, admitted during trial ECF 12-9, pp. 87).

[41]     ECF 12-7, pp. 87-89.

[42]     *Id*. p. 87 (trial transcript p. 98)

and conclusions regarding Bolton's claim regarding Andrew's "report" are fully supported by the evidence before the trial court and conclude that no reasonable, fairminded jurist would find otherwise.

As to Officer Holland's report,[43] excerpts from it were submitted by Bolton with his Rebuttal Evidence to the Affidavit of Jack A. McGaughey. It only reflects that on November 17, 2008 Bolton himself had attempted to write a letter from jail to Darlene Walker and that Holland made a digital recording of an interview with Walker and a digital recording of a message left on Walker's cell phone (perhaps from Bolton). These items in, or constituting, the report simply confirm that during the period from the incident date until the date of trial Bolton himself tried to make contact with Walker, not the other way around. There is nothing in this record to show that the Holland report, if it existed,  is exculpatory of Bolton. There is nothing in this record to show that the report if produced would have produced favorable evidence. Neither the report or the entries therein constitute credible evidence that Walker's trial testimony concerning the sexual manner of Bolton's assault on her was false.  There is nothing in this record to show that if Holland had testified his testimony would have produced evidence favorable to Bolton.  While Holland was apparently engaged by the Texas Rangers to investigate the misdeeds of jail officials occurring or perpetrated in and about the Montague County Jail, including, perhaps, details of the involvement of Darlene Walker in sexual activities with inmates (other than Bolton himself), that information would have simply been surplusage to the same information elicited from Walker herself during her trial testimony.  I find that Bolton has wholly failed to show that the testimony of Holland or the use of his report would have produced evidence favorable to Bolton. I find that Bolton has failed to show a reasonable probability that the outcome of his trial would have been different had Holland testified

---

[43]     ECF 12-9, pp. 168-70.

or had his report been made available to Bolton's counsel. I find that no reasonable, fairminded jurist would conclude otherwise.

Ineffectiveness of Counsel Claim

In response to Bolton's claims of ineffectiveness of his trial counsel, his attorney Edmond Zielinski submitted his own affidavit[44] fully describing the nature, extent and character of his representation of Bolton, including therein a thirty-nine (39) page trial memorandum that he furnished to Bolton prior to trial containing his legal analysis of the charges, the potential defenses available, and his on legal assessments of applicable trial strategies.[45]

Bolton faults his counsel for (1) failing to investigate, locate, and use the motorola cell phone, and the letter, (2) not conveying to the prosecutor Bolton's acceptance of a second plea offer; and (3) bullying Bolton into going to trial for counsel's own financial interest. As reflected above, Bolton has wholly failed to set forth any evidence to overcome the trial court's findings regarding the cell phone or the letter. Nor is there any evidence in this record of a second plea offer tendered by or from the prosecution that Bolton could accept as a foundation of his claim that his counsel failed to communicate his acceptance of such an offer. Finally, the trial transcript and affidavit testimony of Zielinski and McGaughey, which the trial court found credible, wholly negate any claim of bullying by Zielinski, an allegation wholly fabricated from the Bolton's own imagination. The record fully reflects the high character and quality of Zielinski's trial work on Bolton's behalf. The trial memorandum prepared by Zielinski clearly reflects the high quality of his trial preparation. There is no evidence of any financial motive for Zielinski to bully Bolton into either rejecting a plea

---

[44]     ECF 12-9, pp. 94-99.

[45]     *Id*. pp. 100-138 (receipt of which memorandum by Bolton is acknowledged by Bolton at arraignment. *See* Vol.2 Trial Transcript pages 16-18 at ECF 12-7, pp. 17-18.)

offer or insisting upon a trial.

To prevail on an ineffective assistance of counsel claim, a petitioner must demonstrate that "(1) counsel's performance was deficient and (2) counsel's deficient performance caused actual prejudice to the petitioner's defense." *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052 (1984)). Counsel's performance was deficient if it was objectively unreasonable at the time of the representation. *Id*. This is called the First *Strickland* Prong.

If it is determined that trial counsel's performance was deficient, the petitioner must then demonstrate that he was actually prejudiced by trial counsel's deficiencies. *Richards*, 566 F.3d at 564. This is called the Second *Strickland* Prong. "To demonstrate prejudice, a petitioner 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id*. (quoting *Strickland*, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* "Actual prejudice," requires something more than pointing to "[a] mere possibility of prejudice," because a speculative claim "will not satisfy the actual prejudice prong of the cause and prejudice test." *U.S. v. Shaid*, 937 F.2d 228, 236 (5th Cir. 1991)  The trial court's findings as to the effectiveness of Bolton's counsel are supported by the evidence and Bolton has produced no evidence to the contrary.

I find that Bolton wholly failed and still fails to show that he received ineffective assistance of counsel or prejudice to his defense from any performance by his counsel. I  conclude that no reasonable, fairminded jurist would find or conclude otherwise.

## Claim of Actual Innocence

Bolton makes a claim that he is actually innocence of the sexual assault of Darlene Walker. Once a defendant has been afforded a fair trial and convicted of the offense for which he was

charged, the presumption of innocence disappears. *Cf. Ross v. Moffitt*, 417 U.S. 600, 610, 94 S. Ct. 2437 (1974). The petitioner must be able to prove "factual innocence, not mere legal insufficiency" and "demonstrate that, 'in light of all the evidence, "it is more likely than not that no reasonable juror would have convicted him.'")[46]

In *Sawyer v. Whitley*, 505 U.S. 333, 112 S. Ct. 2514 (1992) the Supreme Court recognized that on habeas corpus a federal court could consider a claim of "actual-innocence" but held that under such claim, "the petitioner must show 'by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner' guilty. *Id.*, at 336." The next year in *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853 (1993), the Court addressed the issue of a "freestanding" claim of actual-innocence, a claim not otherwise accompanied by any other claim of a constitutional violation, holding: "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding" and "the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." *Id.* 399. In *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995), the Supreme Court rejected the idea that actual innocence exists as a freestanding constitutionally cognizable claim [47] but discovered the "gateway" by which the actual innocence claim could be considered by the federal court on habeas review.

In later cases the Supreme Court set forth the "gateway" standards for consideration of an actual-innocence claim on federal habeas. Many of the cases addressing the "gateway" arise in the factual context of circumstances where a petitioner is barred by a *procedural default* from having

---

[46]     *Bousley v. U.S.* 523 U. S. 614 (1998) quoting *Schlup, supra*.

[47]     *Schlup*, supra at 315.  "Schlup's claim of innocence does not by itself provide a basis for relief."; *Foster v. Quarterman*, 466 F.3d 359, 367-68 (5th Cir. 2006) (noting that in *House v. Bell*, 547 U.S. 518, 126 S. Ct. 2064 (2006) left open the possibility of stand-alone actual-innocence claims."); see also *Cantu v. Thaler*, 632 F.3d 157, 167-68 (5th Cir. 2011) (reaffirming refusal to recognize freestanding actual innocence claim in section 2254 proceedings).

the federal court consider the effect of a perceived constitutionally defective trial error might have upon a jury's finding of guilt.[48]  Other cases address the "gateway" in the context of newly discovered evidence so strong that a court cannot have confidence in the outcome unless the court is also satisfied that the trial was free of non-harmless constitutional error.[49]

The Supreme Court has defined a claim of "actual innocence" as constituting either (1) a substantive argument that, as a matter of fact, the petitioner did not commit the acts that constitute his crime of conviction, adding that he must prove such an assertion by "truly persuasive" newly discovered evidence;[50] or (2) a procedural argument that constitutional errors at trial, along with newly discovered evidence of his factual innocence, undermine the certainty of the petitioner's conviction.  Such newly discovered evidence must be so clear and convincing that no reasonable juror would have convicted him in the light of the new evidence.[51]  Whether the "gateway" is the showing of a constitutional defect in the manner of the conduct of a trial (ie. ineffective assistance of counsel or prosecutorial misconduct) or a procedural bar to consideration of a constitutional violation (ie. statute of limitations bar ), the gateway requires the establishment of a constitutional violation or a trial error of constitutional proportions.

Citing *Murray v. Carrier*, 477 U.S. 390, 400, 106 S.Ct. 2639 (1986) the Supreme Court stated that actual innocence means that "in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup, supra* at 329.  The Fifth Circuit has specifically rejected the argument that a showing of actual innocence would warrant

---

[48]      Such as a limitations bar in *McQuiggin v. Perkins*, 133 S.Ct. 1924 (2013); *House v. Bell*, *supra*.

[49]      *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (quoting *Schlup, supra*; accord *Finley v. Johnson*, 243 F.3d 215, 221 (5th Cir. 2001)

[50]      *Schlup*, *supra*.

[51]       *Finley* and *Fairman, supra.* note 48.

habeas relief absent a constitutional violation. *Foster v. Thaler*, 369 Fed. Appx. 598, 601, footnote

3 (2010) (citing *Dowthitt v. Johnson*, 230 F.3d 733, 741(5th Cir. 2000) wherein the court stated:

> "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution -- not to correct errors of fact." *Id.* at 741 n.4 (quoting *Herrera v. Collins*, 506 U.S. 390, 400, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993)). Thus, the petitioner must first raise substantial doubt about his guilt, and then this allows us to examine any procedurally barred constitutional claims. *Id.* at 741.").

As a freestanding claim of innocence, Bolton's claim must fail under *Schlup* and *Foster*.

But Bolton asserts that the prosecution's withholding of the evidence of Walker's statements on the

cell phone and in the letter was a constitutionally forbidden impediment to a successful cross-

examination of her regarding her scanty, unbelievable trial testimony that converted an act of simple

assault into a sexual one. The trial record of this sparse testimony by Walker is set out in Exhibit A

attached to this report.  This is the only testimony in the record expressly related to the sexual nature

of Bolton's assault.

Bolton was not procedurally barred from having the state courts examine all of his

constitutional and evidentiary claims, all of which were exhausted in the state courts in his direct

appeal and his habeas proceeding before filing here.  So I conclude that for his "actual innocence"

claim Bolton must meet the *Sawyer v. Whitley* standard articulated in *Schlup*.  "This standard is so

stringent that it "does not merely require a showing that a reasonable doubt exists in the light of the

new evidence, but rather that no reasonable juror would have found the defendant guilty." *Schlup*,

513 U.S. at 329. "To establish the requisite probability, the petitioner must show that it is more

likely than not that no reasonable juror would have convicted him in the light of the new evidence."

*Id.* at 327.

The unknown, unproved existence of the unknown, unproved statement of the victim on an

unknown, unproved cell phone is not the type of evidence would call into question the jury's prior

finding of Bolton's guilt.  The unknown, unproved statement of the victim in an unfound, unproved

letter is not the type of evidence would call into question the jury's prior finding of Bolton's guilt.

Even if the existence of the cell phone and/or the existence of the letter were established, the content of the statements of the victim contained therein are still unknown and unproved. While the existence of Officer Holland's report is known, neither the existence nor the content of the Andrews report is known. How Andrew's might have testified if called and what effect her unknown report would have had on her cross-examination is wholly speculative, much less what speculative effect the report or her testimony would have had on the jury. The information in Ranger Holland's report, even if it had been presented to the jury, provides no support for Bolton's claim of innocence and it reflects nothing to challenge the jury's determination of Bolton's guilt.

I find that Bolton has wholly failed to establish any constitutional violation by way of prosecution misconduct or ineffectiveness of his counsel, nor has he brought forth any new evidence that would support a reasonable doubt by a reasonable juror of his guilt. The jury simply believed Darlene Walker's testimony as to the sexual manner of the assault on her by Bolton. The Court of Appeals found this testimony was sufficient. The habeas trail court found likewise. No reasonable, fairminded jurist would find or conclude otherwise.

## Evidentiary Hearing

Bolton requests an evidentiary hearing to "solve the issues that surround the State's failure to disclose exculpatory evidence;" to secure the testimony of Darlene Walker about her cell phone and letter statements about the sexual assault; and to order a Wise County jailer to testify about Darlene Walker trying to pass a letter to Bolton. "Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 131 S.Ct. 1388, 1398 (2011); see also *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011) (same rule applies to factual determinations under section 2254(d)(2)). Here, as in *Pinholster*, the petition concerns only claims under section 2254(d)(1) that were adjudicated on the merits in state

court. As discussed above, Petitioner cannot overcome the limitation of section 2254(d)(1) on the record that was before the state court. Therefore, Petitioner is not entitled to a federal evidentiary hearing. His motion for evidentiary hearing (ECF 32) is hereby DENIED.

### Recommendation

I recommend to the District Court that Bolton's petition be in all things DENIED WITH PREJUDICE.

### Standard Instruction to Litigants

A copy of this report containing findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of this order, report, findings and recommendations must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

It is so ORDERED, this 10th day of November, 2015.

Robert K. Roach
UNITED STATES MAGISTRATE JUDGE

22

Sexual Assault Testimony

ECF 12-7, pp. 76-78 (TR 55-57)[52]

A .  It was, like, close to --  I mean, close to Nocona on a dirt road.

Q . All right.

A.  That was the only time that he actually really stopped, and he was demanding for me to admit to having an affair and he ripped my pants off.

Q.  What kind of pants did you have on?

A.  I had, like, thin black striped slacks.

    M R.  ZIELINSK I :   I' rn sorry.  I didn' t hear.

Q.  ( BY  MR. McGAUGHEY)  Could you say that again?

A. They were, like,  slacks and they had pinstripes

TR on them. They were thin.

He grabbed them at the – between my legs and ripped them. And he didn't rip them completely off, so he was hitting me telling me to get them off. And then once I qot them off, he ripped my underwear on one side and was hitting me and told me to get them off ,

Q. Get the panties off, you mean?

A. Uh-huh.

Q. And then what did he do?

A.  He stuck his fingers up my vagina and my anus and said that he could tell by doing that that I had been with someone else.

Q.  What did he say?

A.  He said I was all blowed out.

Q.  To indicate that he thought --

A.  He thought I had been --

Q. --  you were having sex with someone?

A .  Uh-huh.

 - - -

Q.   Now, this penetration, you say, he stuck his finger in your vagina and in your anus.  Was that painful in itself?

A.  When he – he tried to rip me, he grabbed a hold and pulled.

Q.  You said what now?  He would –

A.  He was trying to, like, tear me.

Q.  Are you speaking of your vagina?

A.  Un-huh.

(TR 59-60)

Q.  Were there any other times during this trip when the penetration occurred again?

A. The pants that he gave me kept gapping in the back. And he was screaming that, I told you to put them on. And I would try to pull them up, but they kept -- they didn't fit me right. And every time he would see, like, they were gapping, he would think that I didn' t have them on and he would make me take them back down and he would stick his fingers up me again. He would make me stand up, kind of, in the car so that he could do it to me.

---

[52]        These references to the page numbers of the trial transcript.

23

Q . Now, on these occasions were you doing this because you wished to or consented to it at all?

A. No.

(TR 63-64)

Q . So they came to you or an officer came out there?
A. Yes.
Q. Did you report, basically, to him what had occurred?
A. I told them that he beat me up and that he had ripped my clothes off. And that's all I told them.
Q. Okay. Did you tell him anything about him violating you with his finger?
A . No.
Q. Why would you not tell the officer that at that time?
A. I was embarrassed and I was in shock. I didn't -- he didn't ask so I didn't want to tell.